IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TYLER JOSEPH POTTS, | ) | CASE NO.  1:25-CV-01357-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Tyler Joseph Potts ("Plaintiff" or "Potts"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

In August 2022, Potts filed an application for POD, DIB, and SSI, alleging a disability onset date of April17, 1992,[2] and claiming he was disabled due to learning disability, schizoaffective disorder, depression, anxiety, and PSTD.  (Transcript ("Tr.") at 18, 83.)  The applications were denied initially and upon reconsideration, and Potts requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 18.)

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.
[2] At the hearing before the ALJ on May 21, 2024, Potts amended his alleged disability onset date to August 5, 2022, and withdrew his application for POD and DIB.  (Transcript ("Tr.") at 18.)

1

On May 21, 2024, an ALJ held a hearing, during which Potts, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 18.)  On June 7, 2024, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 18-29.)  The ALJ's decision became final on May 1, 2025, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On June 30, 2025, Potts filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 8, 10-11.)  Potts asserts the following assignments of error:

> (1)  The ALJ's step two, step three, are [sic] residual functional capacity findings are unsupported by substantial evidence. The ALJ failed to build an accurate and logical bridge from the evidence to the adverse findings. The ALJ erred when failing to evaluate the medical opinions and prior administrative medical findings pursuant to the revised regulations.

(Doc. No. 8 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Potts was born in April 1992 and was 32 years-old at the time of his administrative hearing (Tr. 18, 28), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c).  He has at least a high school education.  (Tr. 28.)  He has past relevant work as a nut sorter and furniture assembler.  (*Id.* at 27.)

### B.    Relevant Medical Evidence[3]

On October 2, 2012, Potts saw Aaron R. Becker, Psy.D., for a psychological evaluation at the request of the Ohio Rehabilitation Services Commission/Richland County Pathways to assess Potts' needs and provide recommendations regarding appropriate interventions and services.  (*Id.* at 389-96.)  Dr. Becker

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Potts only challenges the ALJ's mental findings, the Court further limits its discussion of the evidence to Potts' mental impairments.

noted that the information provided by Richland County Pathways showed a previous diagnosis of ADHD and a history of an IEP for a learning disability while Potts was in school. (*Id.* at 389.)  Potts presented "as childlike but personable, tries to please others, and might be at risk for being taken advantage of." (*Id.*)  Dr. Becker noted that Potts had graduated high school, although Potts was on an IEP and involved in speech therapy classes. (*Id.* at 389-90.)  Potts had received mental health services as a juvenile and had been prescribed Ritalin for his ADHD. (*Id.* at 390.)  Potts stated he did not like taking the medication and did not believe he needed it. (*Id.*)  Potts denied receiving counseling or psychotherapy, and he had never been admitted to an inpatient psychiatric unit. (*Id.*)

Potts reported he had been unable to pass the permit test to get his driver's license and was working with Pathways to obtain his driver's license and employment. (*Id.*)  He told Dr. Becker he got five hours of sleep a night. (*Id.*)  He sometimes stayed up late playing video games or watching TV, which then caused him to sleep throughout the day. (*Id.*)  Potts reported limited concentration and told Dr. Becker he needed a lot of reminders to complete required tasks. (*Id.*)  His hobbies included riding a skateboard, playing basketball, singing, writing poems, and playing video games. (*Id.*)  Potts described his current mood as "'good'" and denied worries, fears, or anxieties that negatively impact his functioning. (*Id.*)  Potts avoided situations that required sustained attention and concentration. (*Id.*)  He missed details and made "careless mistakes in his work." (*Id.*)  Potts reported being forgetful when it came to his daily activities, and he would "jump from one activity to the next without completing the first." (*Id.* at 390-91.)  Potts endorsed procrastination, impatience, impulsivity, and the inability to sit still. (*Id.* at 391.)  He became "easily frustrated by difficult and intense tasks." (*Id.*)  He helped with cooking, dishes, and laundry, and he could shop for groceries, although he bought foods that were easy to prepare. (*Id.*)  Potts reported impulsive spending. (*Id.*)  Dr. Becker noted that when he asked Potts a simple budgeting question, Potts "made the obvious mistake of choosing to purchase desired items rather than needed items first." (*Id.*)

3

On examination, Dr. Becker found Potts alert and oriented with logical and goal-directed thought processes.  (*Id.*)  Potts displayed a normal mood and euthymic affect for most of the evaluation, although Potts became "frustrated and upset" during the testing portion of the examination.  (*Id.*)  Dr. Becker noted Potts appeared to have a low tolerance for stress and he became agitated easily.  (*Id.*)  Potts spoke with a "slight speech impediment, though in general he could be understood."  (*Id.*) On the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), Potts achieved a full-scale IQ of 75, with scores of 76 for verbal comprehension, 90 for perceptional reasoning, 66 for working memory, and 81 for processing speed. (*Id.* at 391-92.)  Potts' working memory index fell in the first percentile.  (*Id.* at 392.)  The Wide Range Achievement Test – Fourth Edition ("WRAT-4") revealed a grade equivalent of 3.1 in word reading, 4.7 in sentence comprehension, 3.3 in spelling, 7.3 in math computation, and "N/A" in reading composite.  (*Id.*) Potts' WRAT-4 results showed "significant deficits in academic functioning and resulting limits to his occupational and academic performance and ability."  (*Id.* at 392.)  The Adaptive Behavior Assessment System II ("ABAS-II") revealed that Potts was "functioning at the 5th percentile and his overall level of adaptative behavior can be described as being in the Borderline Range of functioning."  (*Id*. at 393.)  Dr. Becker described Potts' "primary areas of weakness" as an "extremely low score in Self-Direction" and "borderline scores in both Functional Academics and Communication."  (*Id.*)

Dr. Becker diagnosed Potts with ADHD, combined type, and borderline intellectual functioning. (*Id.* at 394.)  While Potts' intellectual and academic achievement testing showed overall functioning in the borderline range, Potts' performance on the Perceptual Reasoning Index of the WAIS-IV suggested he could work "in an environment that requires manual labor and even the use of simple tools and or machines."  (*Id.* at 395.)  Dr. Becker opined that Potts needed "significant intervention and those involved in his training must be aware that he is impulsive in nature and likely has little patience in activities for which he sees little need or believes are suggestive of his having any types of deficits or problems. For example, as the

4

intellectual assessment and academic achievement testing became more difficult, his frustrations lead him to almost discontinuing the testing session prior to its completion." (*Id.*)  Dr. Becker further opined that it was "unlikely that [Potts] would qualify for MRDD services." (*Id.*)

On October 4, 2021, Potts saw Debora Van Romer, LPCC, for an initial assessment.  (*Id.* at 397.) Potts reported experiencing anxiety and depression for the past two years, and he wanted to manage them better.  (*Id.*)  Potts told Van Romer that he stayed to himself and didn't have any friends now.  (*Id.*)  He enjoyed writing music, singing, skateboarding, and playing video games and basketball.  (*Id.* at 398.)  Potts reported that he had acid reflux from his anxiety.  (*Id.* at 403.)  He wanted to learn effective communication skills because he liked people and wanted to be able to communicate better with others.  (*Id.* at 405.)  He preferred telehealth.  (*Id.* at 404.)  On examination, Van Romer found a neat and appropriate appearance, normal eye contact, withdrawn, compulsive, preoccupied, nervous/anxious, hyperactive, sleepy, and avoidant/guarded/suspicious behavior, normal speech, depressed, sad, anxious, afraid, and apprehensive mood, normal affect, normal perception, normal thought content, normal thought processes, normal intellectual functioning, normal memory, and normal insight and judgment.  (*Id.* at 399-400.)  Van Romer estimated Potts' intelligence as average.  (*Id.* at 400.)  Van Romer diagnosed Potts with schizoaffective disorder, depressive type.  (*Id.* at 408.)

Potts participated in individual therapy by telehealth through December 2021.  (*Id.* at 451-87.)  On October 7, 2021, Howard Van Romer, LPCC, noted that Potts' paperwork "shows he is cognitively challenged."  (*Id.* at 451.)  On October 18, 2021, Potts reported that singing helped him feel less anxious and depressed.  (*Id.* at 460.)  On October 20, 2021, Van Romer noted Potts had a positive affect.  (*Id.* at 462.)  On October 28, 2021, Potts reported that he liked to ride his bike and told Van Romer that he had been less anxious and depressed that week.  (*Id.* at 468.)  On November 11, 2021, Potts told Van Romer that it was hard for him to be around people at times and he would get anxious.  (*Id.* at 476.)  On November 19,

2021, Potts reported he had gotten into fights at school and had been expelled.  (*Id.* at 480.)  Potts told Van Romer he stayed at home and stayed to himself most of the time so he could work on his computer.  (*Id.*)  On November 22, 2021, Potts reported that he made a living by "doing advertising on his computer."  (*Id.* at 482.)

On February 24, 2022, Potts saw Harold Brown, D.O., for follow up and complained of moderate daily GERD, as well as anxiety and depression.  (*Id.* at 426.)  Potts endorsed speech difficulty, dysphoric mood, and nervousness/anxiousness.  (*Id.* at 427.)  On examination, Dr Brown found normal mood, normal behavior, normal thought content, normal judgment, and speech difficulty.  (*Id.*)  Dr. Brown gave Potts a card for Catalyst so Potts could self-refer for mental health services.  (*Id.* at 428.)

On April 6, 2022, Potts saw Dr. Brown for follow up and reported that he was exercising now and had almost quit vaping.  (*Id.* at 410.)  Potts told Dr. Brown his GERD had improved with the reduction in his smoking.  (*Id.*)  Potts endorsed increased anxiety and depression, as well as dysphoric mood and nervousness.  (*Id.* at 410-12.)  On examination, Dr. Brown found normal behavior, normal thought content, normal judgment, and flat affect.  (*Id.* at 411.)  Dr. Brown also noted that Potts appeared anxious.  (*Id.*)  Dr. Brown encouraged Potts to go to the Catalyst walk-in clinic since his anxiety and depression were getting worse and Potts was still waiting for an appointment at Catalyst.  (*Id.* at 412.)

In April through June 2022, Potts continued to participate in individual therapy.  (*Id.* at 488-501.)  On April 28, 2022, Potts reported he has always kept to himself, and while he had a few good friends, he preferred to be alone.  (*Id.* at 490.)  He used marijuana to manage his anxiety and drank alcohol every night to sleep, and he preferred that over medication.  (*Id.*)  On May 5, 2022, Potts reported that he had learned to control his panic when he was in a crowd by removing himself and smoking cigarettes.  (*Id.* at 492.)  On May 12, 2022, Potts reported he had been out more since the weather was better, riding his motorcycle and using his skateboard, which had made him feel better overall.  (*Id.* at 494.) On May 19, 2022, Potts reported

he had spent a lot of time outside, he had stopped drinking, he was sleeping better, and he didn't feel depressed.  (*Id.* at 496.)  On June 16, 2022, Potts reported he had been working less on his gaming platform and was getting out more.  (*Id.* at 498.)  Jennifer Brown, LPCC, noted that Potts seemed to be "in good spirits" and he seemed "to enjoy staying busy," although Potts emphasized that he prefers being alone and not socializing with others.  (*Id.* at 498-99.)  On June 23, 2022, he reported that "he's had more jobs than he could count, leaving them when his depressive episodes left him housebound. He still hears voices and states that he accepts that they are there."  (*Id.* at 500.)

On March 16, 2023, Potts saw John Reece, Psy.D., for a consultative psychological examination via telehealth.  (*Id.* at 647.)  Dr. Reece noted he had been provided background materials, including mental health treatment notes dated October 4, 2021 and a "partial psychological report" that was undated and unsigned, by DDS.  (*Id.*)  Dr. Reece further noted that the partial report included results of WAIS-IV testing conducted when Potts was 20, showing a full-scale IQ of 75 (borderline range), although "the reason for the testing and who did the testing was not included in the partial report."  (*Id.* at 649.)  Potts reported having an IEP for learning problems, and told Dr. Reece that he did not get along with other students.  (*Id.* at 648.) He also argued with his teachers.  (*Id.*)  Potts described "behavior problems because of fighting, insubordination, angry outbursts, and leaving class."  (*Id.*)  He also endorsed a history of attendance problems because he didn't want to go to school.  (*Id.*)  Potts reported having been fired from multiple jobs because of his attendance.  (*Id.* at 650.)  He denied problems with supervisors but endorsed arguments with coworkers.  (*Id.*)  Potts told Dr. Reece he struggled to comprehend oral instructions, and he needed reminders; it was better when he was shown how to do a task.  (*Id.*)  He could perform repetitive tasks.  (*Id.*) Potts stated he would either keep working or leave work early if he experienced pressure in the workplace. (*Id.*)  Potts spent his day taking care of his personal hygiene, doing household chores, occasionally preparing food, and playing videogames.  (*Id.*)  He and his mother cleaned the house.  (*Id.*)  His mother did most of

7

the cooking and she did the shopping. (*Id.*)  Potts could shop. (*Id.*)  He described his ability to read, write, and spell as fair and his ability to do arithmetic was good to fair. (*Id.*)

In terms of his mental health symptoms, Potts described his typical mood and appetite as okay. (*Id.* at 649.)  He struggled with falling and staying asleep. (*Id.*)  He sometimes became emotional and felt depressed. (*Id.*)  Potts endorsed feelings of helplessness, hopelessness, worthlessness, and guilt, as well as low energy and mood swings. (*Id.*)  Potts told Dr. Reece he felt anxious/nervous because of his worries, as well as when he interacted with others, was in public, or left the house. (*Id.*)  Potts denied panic or anxiety attacks, but reported times of increased anxiety with a racing heart, lightheadedness, fear of dying, and an inability to think straight. (*Id.*)  Potts also endorsed feeling suspicious and distrustful of others, and feeling like others were watching, discussing, or ridiculing him. (*Id.*)

On examination, Dr. Reece found a neat and clean appearance with good eye contact, minimal facial and gestural expressiveness, and normal to monotone tone of voice. (*Id.* at 650.)  Dr. Reece noted signs of anxiety, including fidgeting and smoking a cigarette. (*Id.*)  Potts "spoke insecurely, with no /R/ sound," but Potts' articulation was unimpaired, and Dr. Reece found Potts "98% understandable." (*Id.*)  Dr. Reece noted Potts "often required repetition/restatement." (*Id.*)  Dr. Reece further found problems with articulation, as well as simplistic syntax, low vocabulary, and vagueness. (*Id.*)  Potts often paused before answering, which gave Dr. Reece the "impression of defensiveness and mild confusion." (*Id.*)  Dr. Reece further found a constricted affect, a mild to moderate dysphoric and anxious mood, well-organized to concrete thought associations, good short-term memory, fair working memory, and adequate to fair insight. (*Id.* at 650-52.)  Potts completed three of three basic mental computations tasks. (*Id.* at 651.)  Potts demonstrated good word knowledge and verbal concepts skills, fair abstract reasoning skills, and good to fair comprehension. (*Id.*)  Dr. Reece noted satisfactory concentration and persistence and slightly slowed to slowed pace of problem solving. (*Id.*)  Potts' diagnoses consisted of unspecified depressive disorder, unspecified anxiety disorder,

unspecified trauma and stressor-related disorder, borderline intellectual functioning, and alcohol use disorder, in reported partial remission.  (*Id.* at 652.)  Dr. Reece noted Potts was able to follow instructions during the examination, he had no trouble concentrating during the exam, and "[h]e reported no problems performing repetitive tasks in the past workplace."  (*Id.* at 652-53.)  Dr. Reece determined Potts showed avoidant personality traits.  (*Id.* at 653.)  Potts' "[c]urrent deficits in dealing with stress and pressure in the workplace" consisted of depression, anxiety, emotional instability, and substance abuse in partial remission.  (*Id.*)

On April 25, 2023, Potts saw Lydia Ady, LSW, for a behavioral health screening after he was referred by Medicare.  (*Id.* at 793.)  Potts reported increasing anxiety and stress.  (*Id.*)  He told Ady he did not like to be around people, and he only became anxious when he was around big groups of people.  (*Id.*)  He enjoyed doing odd jobs for money.  (*Id.*)  Sometimes, his depression became so bad that he could not get out of bed.  (*Id.*)  Potts also endorsed hearing dark voices that were not his and that wanted him to hurt himself.  (*Id.*)  He wanted to work on his depression.  (*Id.*)  Potts reported he did not want to take medication; he had tried many in the past and they made him feel worse.  (*Id.*)  Potts also endorsed suicidal thoughts.  (*Id.* at 794.)  On examination, Ady found Potts well-groomed, pleasant, and cooperative.  (*Id.* at 793.)

Potts continued to receive mental health treatment by video telehealth for the rest of 2023 and into early 2024.  (*Id.* at 772-92, 802-05.)

On August 15, 2023, on examination, Ady found Potts well-groomed, pleasant, and cooperative with normal speech, logical and goal-directed thought process, intact associations, an anxious and flat affect, intact insight, fair judgment, and limited fund of knowledge.  (*Id.* at 781, 787-88.)

On October 4, 2023, Potts reported "doing pretty good," although he thought his depression was "kicking in" and he had been going to bed early.  (*Id.* at 776-77.)  He also endorsed a manic episode that had lasted for about a week, and he sometimes stayed up for about five days.  (*Id.* at 777.)  On examination,

9

Ady found Potts well-groomed with appropriate affect and average eye contact.  (*Id.* at 776.)  Ady found Potts was doing "minimally worse" since their last session.  (*Id.* at 777.)

On October 18, 2023, Potts reported he had been staying up late and waking up late.  (*Id.* at 774.) On examination, Ady found Potts well-groomed with appropriate affect and average eye contact.  (*Id.*)  Ady noted Potts had made moderate improvement since their last session.  (*Id.* at 775.)

On November 15, 2023, Potts reported sleeping better and "that everything has been good."  (*Id.* at 772.)  On examination, Ady found Potts well-groomed with appropriate affect and average eye contact. (*Id.*)  Ady noted Potts had made minimal improvement since their last session.  (*Id.* at 773.)

On February 7, 2024, Potts reported doing well and playing lots of video games.  (*Id.* at 804-05.) He told Ady he didn't think he could work because of his mental health.  (*Id.* at 805.)  He stated his mental health had caused him to want to go home and sleep instead of work, and that he had an "'attitude'" at work. (*Id.*)  On examination, Ady found Potts well-groomed with appropriate affect and average eye contact.  (*Id.*) Ady found no change since their last session.  (*Id.*)

On March 6, 2024, Potts reported taking his vitamins and that he had been able to control his anxiety. (*Id.* at 802-03.)  On examination, Ady found Potts well-groomed with appropriate affect and average eye contact.  (*Id.* at 802.)  Ady noted no change from their last session.  (*Id.* at 803.)

C.    **State Agency Reports**

On April 16, 2023, Nicole Robicheau, Ph.D., reviewed the file and opined Potts had a mild limitation in his ability to interact with others and a moderate limitation in his ability to understand, remember, or apply information, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.* at 89, 91.)  Dr. Robicheau opined that there was "insufficient evidence in file or [sic] the DLI time period. 09/30/2021 DLI. Unable to assess psychiatric signs, sxs, and cognitive functioning prior to DLI."  (*Id.* at 91.)  Dr. Robicheau further opined Potts could "understand, remember, and carry out simple instructions," "concentrate, persist,

10

and maintain pace to carry out a simple learned routine in a structured and predictable work setting," and "manage himself in a structured and predictable work setting, where changes can be explained." (*Id.* at 93-94.)

On August 11, 2023, on reconsideration, Ann Lovko, Ph.D., affirmed Dr. Robicheau's findings. (*Id.* at 113-15, 117-18.)

## D.    Hearing Testimony

During the May 21, 2024 hearing, Potts testified to the following:

- He holds a driver's license. (*Id.* at 46.)  He has a hard time driving at night because he has a little trouble seeing at night. (*Id.*)  He lives in a house with his mom and girlfriend. (*Id.*)

- He graduated high school. (*Id.*)  He had an IEP all through school. (*Id.* at 46-47.)

- He has trouble with reading, writing, math, and speech. (*Id.* at 47.)  He can read and write easy words. (*Id.*)  When he worked as a furniture assembler, he looked at the pictures and did the best he could because he couldn't read the instructions. (*Id.*)  He cannot read bigger words. (*Id.*)

- His mom and girlfriend remind him to do laundry, dishes, and yardwork, as well as clean up after himself. (*Id.* at 47-48.)  He cannot remember to do these things. (*Id.* at 48.)  He does not know how much laundry soap to use; he just guesses how much he thinks he needs. (*Id.*)  He has put bleach in the wash instead of detergent and ruined his clothes. (*Id.*)  His girlfriend reminds him to shower. (*Id.* at 50.)  He has gone two weeks without a shower before. (*Id.*)

- If given instructions as to how to heat up lasagna, he might not read all the instructions and might forget some things because it is difficult to do. (*Id.* at 48-49.)  If given a list of things to buy at the grocery store, he could read the list and get the items if the list consisted of "easy words." (*Id.* at 49-50.)  He would not know whether the cashier at the store gave him back the correct change. (*Id.* at 50.)

- He has a cell phone, and he knows how to look up contacts and call people. (*Id.* at 49.)  He can text, but he uses voice to text because he only knows how to text the words he can spell. (*Id.*)

- He listened to the test for his driver's permit. (*Id.*)  He failed his permit or driver's test before getting his license. (*Id.*)

- He has been fired for not understanding what he was doing or doing something incorrectly. (*Id.* at 52.)  He had trouble with coworkers because of his speech. (*Id.*)

11

They made fun of him because he could not say certain words.  (*Id.*)  He would get mad and feel unwelcome.  (*Id.* at 53.)  He cannot be around a lot of people.  (*Id.*)  If he goes to the store and there are a lot of people, he must leave.  (*Id.*)

- He has anxiety and depression.  (*Id.* at 51.)  His anxiety gets so bad that he cannot talk because he is out of breath, and he stumbles and can fall when he walks.  (*Id.*)  He gets three or four anxiety attacks a day.  (*Id.*)  His depression causes him to be in bed for "months at a time."  (*Id.*)  He sleeps and stays in his room.  (*Id.*)  That has happened a lot lately.  (*Id.*)  He uses music to cope, and listening to music is better than the voices he hears.  (*Id.*)  He hears voices telling him to hurt himself when his anxiety and depression are at their worst.  (*Id.*)  He has a hard time leaving the house.  (*Id.* at 52.)  He struggles with nightmares and wakes up with anxiety attacks.  (*Id.*)  He has PTSD, which causes him to "stay up half the night" checking locks and windows to make sure everything is locked.  (*Id.*)  He does this daily.  (*Id.*)

- He takes vitamins for his anxiety and stress.  (*Id.* at 53.)  He needs reminders from his mom or girlfriend to take his vitamins.  (*Id.*)  He also smokes menthol cigarettes to calm him if he doesn't take his anxiety medication on time.  (*Id.* at 55.)  He doesn't want to try other anxiety medications because one didn't work, and another one worsened his anxiety.  (*Id.* at 55-56.)

- He stays in his room when family members come to visit.  (*Id.* at 56.)  He plays video games with his girlfriend's brother.  (*Id.*)

The VE testified Potts had past work as a furniture assembler and nut sorter.  (*Id.* at 58.)  The ALJ then posed the following hypothetical question:

> We'll be considering [a] younger individual, high school education.  I do note that there was [an] IEP in place for that education.  The past work that's been identified.  The State Agency did not issue any physical exertional limitations, but I'm going to be a little bit more protective with respect to the shoulder complaints with no climbing of ladders, ropes, or scaffolds, with medication management, no work at unprotected heights, no work around hazardous machinery, no requirement for commercial driving, only occasional left upper extremity overhead reach.  We'll place the right dominant handling and fingering at frequent.  Looking at, with the inhaler use, avoid concentrated exposure to extreme cold, heat, humidity, wetness, pulmonary irritants.  The State Agency will have assessment accepting the moderate B1 criteria.  They found mild social, I'm instead going to look at moderate social, moderate concentration, persistence, and pace, and moderate adaptation, I agree with.  Translating those to simple, routine work with the social interaction limitation.  No requirement for work with the general public as part of routine job duties.  Only occasional interaction with coworkers and supervisors.  With that moderate, that simple, routine work, we want instructions to be more of a verbal or demonstration nature.  We'll have only occasional telephone use, and we did restrict no work with the general public as part of routine job duties, with moderate concentration, persistence, and pace.

12

> Again, simple, routine work.  No fast paced production assembly line work or work with a machinist setting the pace.  We want to ensure the work is of a variable rate looking more towards end of day work goals.  No strict hourly production requirements.  Let's also restrict no tandem routine job tasks with coworkers, and with moderate adaptation, only occasional decision making, only occasional changes in the work setting.  Contemplating hypothetical number one, would such an individual be capable of performing any of the Claimant's past work?

(*Id.* at 59-60.)

The VE testified the hypothetical individual would be able to perform Potts' past work as a nut sorter. (*Id.* at 60.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as marker, routing clerk, inspector and hand packager (light exertion), as well as laundry worker and hospital cleaner (medium exertion), and table worker, addresser, and stem mounter (sedentary exertion).  (*Id.* at 60-62.)

The ALJ modified the hypothetical as follows:

> [I]f the individual was assessed with a marked level of social interaction requiring the individual to have more of an isolated workstation with communication with supervisors more shift change [sic], would such an individual be capable of performing any competitive work under hypotheticals one or two?

(*Id.* at 62.)  The VE testified that these limitations would be work preclusive.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order

13

to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV.     SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant has not engaged in substantial gainful activity since August 5, 2022, the protective filing date (20 CFR 416.971 *et seq*.).

2.     The claimant has the following severe impairments: chronic obstructive pulmonary disease (COPD); depression; anxiety; post-traumatic stress disorder (PTSD); schizoaffective disorder; and borderline intellectual functioning (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except no climbing ladders, ropes, or scaffolds; no work at unprotected heights or around hazardous machinery; no requirement for commercial driving; occasional overhead reaching with the left upper extremity; frequent handling and fingering with the right dominant upper extremity; avoid concentrated exposure to extreme cold, heat, humidity, wetness, or pulmonary irritants; occasional use telephone use; and instructions of a verbal or demonstration nature. The claimant is further limited to simple routine work; no requirement for work with the general public as part of routine job duties; occasional interaction with co-workers and supervisors; no fast paced production

14

such as assembly line or work where machine sets the pace, work is of variable rate; only occasional decision-making; only occasional changes in the work setting; no strict production or hourly requirements, end of day work goals; and no tandem routine job tasks with co-workers.

5. The claimant is capable of performing past relevant work as a nut sorter (DOT 521.687-086). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

6. The claimant has not been under a disability, as defined in the Social Security Act, from April 17, 1992, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 20-29.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.

15

1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.     ANALYSIS

As part of his sole assignment of error, Potts maintains that the ALJ ignored evidence at Steps Two and Three, and these errors impacted the RFC finding. (Doc. No. 8 at 11.) Potts asserts that the ALJ ignored

16

the test results of the WAIS-IV, WRAT-4, and ABAS-II administered by Dr. Becker and referenced in Dr. Reece's report.  (*Id.* at 15-16.)  Potts argues:

> The ALJ did not acknowledge the intelligence test scores and merely stated "the *claimant reported* borderline intellectual functioning, problems comprehending, and retaining oral instructions" to consultative examiner Dr. Reece. Tr. 22 (emphasis added). This implies that Dr. Reece relied only upon Plaintiff's subjective allegations and did not rely upon the objective testing within Dr. Becker's report. The ALJ's statement does not address that Dr. Reece reviewed a portion of Dr. Becker's report containing the test scores. Based upon the ALJ's failure to evaluate the actual test scores and the possibility that Plaintiff could meet a portion of listing 12.05, it is unclear whether the ALJ considered the objective findings of Dr. Becker at step three when assessing the paragraph B criteria, and it is further unclear whether the ALJ considered the objective findings in relation to the RFC finding. As noted above, the ALJ referenced back to the paragraph B findings when citing to the alleged support for the RFC finding, but the ALJ never discussed the favorable objective evidence at step three in relation to the paragraph B findings. Tr. 21-22, 25.

(*Id.* at 16) (emphasis in original).

While the Commissioner responds to Potts' Step Three argument, the Commissioner fails to address Potts' argument that the ALJ erred in failing to discuss the results of the intelligence testing administered by Dr. Becker in 2012 in the RFC analysis.  (Doc. No. 10.)  The closest the Commissioner comes is a statement that Potts "cannot look at the ALJ's analysis of his testimony and Dr. Reece's opinion noting that he was assessed with avoidant personality traits and realistically argue that the ALJ selectively considered the evidence" (*id.* at 13), and an assertion in response to Potts' argument regarding the ALJ's evaluation of the medical opinion evidence that "the ALJ did not err by noting that the October 2012 [opinion]—that was provided almost 10 years before Plaintiff's August 5, 2022 amended alleged onset date—was not relevant to the period at issue."  (*Id.* at 17.)  In a footnote in the fact section of his brief, the Commissioner states that state agency psychologist Dr. Robicheau "discussed Plaintiff's IQ score and diagnoses."  (*Id.* at 5 n.3.)

Potts responds that the ALJ's Paragraph B findings at Step Three lacked the support of substantial evidence "given that the ALJ failed to acknowledge the existence of objective evidence relating to intelligence, academic, and adaptive functioning relevant to Plaintiff's disability."  (Doc. No. 11 at 1.)

17

Because the ALJ referred to the Step Three findings to support the RFC finding, Potts asserts the RFC finding also lacks the support of substantial evidence.  (*Id.* at 1-2.)   Potts argues:

> As noted by the colloquy between the ALJ and Plaintiff's attorney identified by Defendant, the ALJ was aware of significantly low intellectual functioning but failed to evaluate this evidence in relation to any of her findings. Tr. 40. Even if Defendant is correct that the argument regarding listing 12.05 was waived by the attorney's statements at the hearing, Defendant does not explain how the ALJ was permitted to completely disregard this evidence. *See* Com. Br. 8-10. Relatedly, neither Defendant nor the ALJ explains how the IQ scores are no longer relevant. *See* Pl. Br. at 14-15. The Commissioner's own policy indicates that intellectual disability is not expected to change over time. *See* SSR 18-1p ("Non-traumatic impairments may be static impairments that we do not expect to change in severity over an extended period, such as intellectual disability").

(*Id.* at 9.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. 416.945(a)(1).   A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why

the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered*.  See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

In discussing Dr. Becker's opinion in the RFC analysis, the ALJ found as follows:

> The undersigned also notes the psychological evaluation at Exhibit 2F performed
> to identify the claimant's needs and to provide recommendations of appropriate

19

interventions and services from the Ohio Rehabilitation Services. This evaluation was performed in 2012, many years before the claimant's protective filing date, and the findings are not relevant to the period at issue herein. The evaluation has been reviewed for historical purposes as the opinions expressed therein are not related to the current period under review.

(Tr. 26.)

In evaluating Dr. Reece's opinion in the RFC analysis, the ALJ found as follows:

The psychological consultative examiner's report indicates that the claimant was able to follow directions during the exam but reported a history of borderline intellectual functioning and problems with comprehension and retaining oral instructions. The examiner noted that the claimant had no difficulty with concentration during the exam. He further assessed the claimant with avoidant personality traits and identified current deficits in dealing with stress and pressure in the workplace as depression, anxiety, emotional instability, and partial remission of substance abuse. The examiner does not provide specific work-related limitations in vocationally relevant terms and appears to rely largely on the claimant's subjective reports rather than clinical findings. While the examiner's "opinion" is not entirely consistent with the record or otherwise supported by his findings, his findings, including the claimant's normal appearance, pausing before responding, constricted affect, mildly to moderately dysphoric and anxious mood, fair abstract reasoning, fair to good memory, satisfactory concentration and task persistence, slightly slowed to slowed pace of problem solving, and fair to adequate insight and judgment are consistent with moderate limitation in all areas of mental functioning and support the specific mental limitations adopted herein. Thus, to the extent the examiner's report is consistent with the undersigned's limitations, it is persuasive.

(*Id.* at 26-27.)

Nowhere in the ALJ's opinion does she discuss the results of Potts' intellectual testing, despite those records being raised by counsel at the hearing.  (Tr. 40.)  The Commissioner is correct that these records significantly predate the alleged onset date.  However, even assuming the ALJ included the intelligence testing results as part of the findings "not relevant to the period at issue herein," as Potts points out, the ALJ fails to explain why any intellectual testing conducted in 2012—when Potts was 20 years old—would not be valid or relevant to the period at issue.  (*Id.* at 26.)  Furthermore, the ALJ failed to acknowledge that Dr. Reece relied on these test scores as part of his 2023 opinion.  (*Id.* at 26-27.)  In addition, the ALJ failed to

20

acknowledge that Potts' counselor in 2021 noted that Potts' paperwork "show[ed] he is cognitively challenged."[4]  (*Id.* at 451.)

As explained in detail above, if relevant evidence is not mentioned, the Court cannot discern whether the ALJ discounted or overlooked the evidence.  *Shrader*, 2012 WL 5383120, at *6.  In addition, an ALJ may not overlook or ignore contrary lines of evidence.  *See, e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").  Therefore, this matter must be reversed and remanded.

As the Court finds remand is required on these grounds, and in the interest of judicial economy, the Court does not reach Potts' other arguments presented in his sole assignment of error.

---

[4] The ALJ likewise omitted any discussion of findings supportive of disability in discussing Potts' 2021 mental health treatment records, including withdrawn, compulsive, preoccupied, nervous/anxious, hyperactive, sleepy, and avoidant/guarded/suspicious behavior and depressed, sad, anxious, afraid, and apprehensive mood.  (*Id.* at 399-400.)

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Date: March 27, 2026

        *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge